IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

GARDENDANCE, INC., )
 )
 Plaintiff, )
 )
 )
 v. ) 1:04CV00010
 )
WOODSTOCK COPPERWORKS, LTD. and )
THE ROYAL GARDENS OF CHARLOTTE, )
INC., )
 )
 Defendants. )

MEMORANDUM OPINION and ORDER

OSTEEN, District Judge

Defendant Woodstock Copperworks, Ltd. ("Woodstock") brings several counterclaims against Plaintiff Gardendance, Inc. ("Gardendance"). Woodstock asserts that Gardendance infringed U.S. Patent No. 5,547,371 ("'371 Patent"), entitled "Variable Torch Apparatus," in violation of 35 U.S.C. § 271(a) and induced infringement of the '371 Patent, in violation of 35 U.S.C. § 271(b). Woodstock also asserts two state law claims and seeks a declaratory judgment of invalidity of Gardendance's copyright pursuant to Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201.

In a patent infringement case, federal courts must follow a two-step process. The court must (1) construe the "meaning and

scope of the patent claims asserted to be infringed" and (2) compare the construed claims to the alleged infringing product. Markman v. Westview Instruments, Inc., 52 F.3d 967, 976 (Fed. Cir. 1995), aff'd, 517 U.S. 370, 391, 116 S. Ct. 1384, 1396 (1996). Moreover, "the court has the power and obligation to construe as a matter of law the meaning of language used in the patent claim." Id. at 979. Before the court is Woodstock's Motion to Construe U.S. Patent No. 5,547,371, which is the subject of this opinion.

**I. FACTUAL BACKGROUND**

Woodstock and Gardendance are both sellers of lawn torches. The lawn torches are copper and have a torch apparatus that contains a tank of fuel and a wick. Woodstock, on August 20, 1996, procured a patent for a specific design of the copper lawn torches (the "'371 Patent"). Gardendance has a copyright on its lawn torch design, of which Woodstock challenges the validity. Woodstock also claims Gardendance's design infringes the '371 Patent.

**II. ANALYSIS**

This analysis covers the proper construction of the '371 Patent claims. "To ascertain the meaning of claims [in a patent], [a court must] consider three sources: the [text of the patent's] claims, the specification [listed in the patent], and the [patent's] prosecution history." Unique Concepts, Inc. v.

Brown, 939 F.2d 1558, 1561 (Fed. Cir. 1991). The analysis must construe meanings how "one [with] ordinary skill in the art at the time of the invention" would construe them. Markman, 52 F.3d at 986. Because there is no prosecution history for this claim, the discussion considers only the specification and the claim's text.

    A.   The Specification

"The specification contains a . . . description of the invention that must enable one of ordinary skill in the art to make and use the invention. For claim construction purposes, the description may act as a sort of dictionary, which explains the invention and may define terms used in the claims." Id. at 979. Thus, "[c]laims must be read in view of the specification, of which they are a part." Id. However, "[t]he written description part of the specification itself does not delimit the right to exclude. That is the function and purpose of claims." Id. at 980.

The specification here does not limit the claim terms. The specification states that "it is obvious that modifications and changes therein may be made by those skilled in the art to which it pertains without departing from the spirit and scope of the invention. Accordingly, the scope of this invention is to be limited only by the appended claims and equivalents." '371 Patent col.4 ll.4-9 (filed Aug. 20, 1996). Thus, the specification is not a limit on the claim terms' scope. The

3

following discussion, however, shows how the specification illuminates the claim terms.

B.   Claim Terms

Only claim terms 1, 2, 3, 4, and 7 of the '371 Patent are at issue. In determining the meaning of these terms, the court uses the viewpoint of "one of ordinary skill in the art at the time of the invention." Markman, 52 F.3d at 986.

"A patent claim typically has three parts: 1) the preamble; 2) the transition; and 3) the body." E.I. DuPont de Nemours & Co. v. Monsanto Co., 903 F. Supp. 680, 693 (D. Del. 1995) (citing 2 Donald S. Chisum, Patents § 806 [1][b] (1994)). The preamble may summarize the product or specific intended properties and uses. STX, Inc. v. Brine, Inc., 37 F. Supp. 2d 740, 751 (D. Md. 1999). The transition, which may be the word "comprising," connects the preamble to the claim. Id. Finally, the body is the collection of terms that actually defines the item that the patent will protect. Id.

An issue in this matter is whether the preamble of the claim terms limits the body. "Whether to treat a preamble as a limitation is a determination 'resolved only on review of the entire[ ] . . . patent to gain an understanding of what the inventors actually invented and intended to encompass by the claim.'" Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc., 289 F.3d 801, 808 (Fed. Cir. 2002) (alteration in original)

4

(quoting <u>Corning Glass Works v. Sumitomo Elec. U.S.A., Inc.</u>, 868 F.2d 1251, 1257 (Fed. Cir. 1989)). "Where a patentee uses the claim preamble to recite structural limitations of his claimed invention, the . . . courts give effect to that usage." <u>Rowe v. Dror</u>, 112 F.3d 473, 478 (Fed. Cir. 1997). "However, if the body of the claim 'describes a structurally complete invention such that deletion of the preamble phrase does not affect the structure or steps of the claimed invention,' the preamble is generally not limiting unless there is 'clear reliance on the preamble during prosecution to distinguish the claimed invention from the prior art.'" <u>Intertool, Ltd. v. Texar Corp.</u>, 369 F.3d 1289, 1295 (Fed. Cir. 2004) (citation omitted) (quoting <u>Catalina Mktg.</u>, 289 F.3d at 808–09). The preamble at issue is "[a] variable torch apparatus," '371 Patent col.4 ll.11, which appears in each of the claims.

From the text of the entire patent, this phrase clearly must modify the claim terms. Nothing in the claims' bodies suggests that the torch is modifiable. However, throughout the remainder of the patent, the text clearly shows that the claimed invention has modifiable properties.

In the section entitled "Background of the Invention," the patent states this invention differs from past torches in that other torches "are of a single (fixed) configuration, and are therefore difficult to customize and adapt." <u>Id.</u> col.1 ll.21–23. Furthermore, in the "Summary of the Invention" section, the

5

invention is described as "a collection of . . . components [that] may be assembled in a variety of ways to construct numerous home, garden[,] and patio-type torch configurations." Id. col.1 ll.31–34. Furthermore, the invention "can be customized by the user to fit in any location, and can even be disassembled and reconstructed into the same or a different configuration if desired." Id. col.1 ll.58–61. The whole patent shows that a vital part of this invention is that the torch is modifiable, which is not clear from the bodies of the claims. The court must consider the preamble "variable torch apparatus" in construing the claim terms.

In construing the claim terms, "it is [also] permissible for the district court in its sound discretion to admit and use" extrinsic evidence such as dictionaries. Phillips v. AWH Corp., 415 F.3d 1303, 1319 (Fed. Cir. 2005). Dictionary definitions, however, must not be used "in derogation of the 'indisputable public records consisting of the claims, the specification and the prosecution history.'" Id. (quoting Southwall Techs., Inc. v. Cardinal IG Co., 54 F.3d 1570, 1578 (Fed. Cir. 1995)). The court should also consider that dictionaries "may not reflect the understanding of a skilled artisan in the field of the patent" and were not "created at the time of patent prosecution for the purpose of explaining the patent's scope and meaning." Id. at 1318. The dictionary, thus, is a permissible source to consider,

but its use must be reasonable in light of other available evidence.

Woodstock proffers dictionary definitions, and it uses the "OneLook Dictionary Search." <u>See</u> http://www.onelook.com (last visited Oct. 11, 2005). Gardendance notes when it disagrees with the chosen meaning but does not proffer meanings from another dictionary. This appears to be a general usage dictionary because "900 online dictionaries are indexed by the OneLook [dictionary] search engine" to generate definitions. http://www.onelook.com/about.shtml (last visited Oct. 11, 2005). It is reasonable to use such a dictionary from the viewpoint of one skilled in the art at the time of the invention because no parties suggest that any of the claim terms have specialized, technical meanings not likely to be in a general usage dictionary. Moreover, the dictionary is not in derogation of the specification because the specification does not limit the invention. Analysis of each claim proceeds next.

1. Claim 1

Claim 1 of the patent states:

A variable torch apparatus comprising:

    a torch portion having a fuel canister and wick element, said torch portion constructed of a segment of copper pipe which has been capped and sealed;
    a vertical support portion constructed of a length of copper pipe and attached to said torch portion by a copper pipe reducer element; and

7

>     a base portion connected to said vertical support
> portion, said base portion constructed of copper pipe
> material.

'371 Patent col.4 ll.11-19. Both parties state this claim creates three parts for the invention: a torch portion, a vertical support portion, and a base portion. As the following discussion shows, these three parts can be manipulated into a variety of configurations: table-top torches, lawn torches, torches with one or multiple torch portions, and torches of various heights. Thus, "[a]ll . . . variations . . . result from the combination of the three basic components," <u>id.</u> col.3 l.46, col.4 ll.1-2, and this makes the torch a variable torch apparatus.

One of the first disagreements is over the meaning of "copper pipe." While both parties state that pipe is a "hollow body," Gardendance argues that the meaning should be limited to cylindrical pipe. Such a limitation is unreasonable because although all the patent's figures use cylindrical pipe, none of the claims limit "pipe" to only cylindrical pipe. Moreover, the specification states that those "skilled in the art" of coppersmithing can make modifications without departing from the "spirit and scope" of this invention. <u>Id.</u> col.4 ll.3-7. Thus, the specification shows the claim terms should be construed so that a slightly modified apparatus still falls under the claim terms. Changing the shape of the pipe is a minor change.

8

The torch portion has a fuel canister, or "a container for holding combustible matter" and a wick element, or "a bundle of fibers, or a loosely twisted or braided cord, tape, or tube" that draws up fuel. (Def.'s Markman Br. at 9, 12.) There is some confusion over what is "capped and sealed" in the torch portion. Gardendance proffers three possible interpretations. Gardendance's preferred interpretation is not clear from its argument. Woodstock only asserts that "the 'copper pipe' has been closed off and covered." (Id. at 14.)

"Capped" means "[s]omething covering the top or end of a thing." http://www.onelook.com/?other=web1913&w=cap (last visited Oct. 11, 2005). "Sealed" means "to shut close." http://www.onelook.com/?other=web1913&w=seal (last visited Oct. 11, 2005). The difference in the terms appears to be that "seal" is a more complete "closing off." The specific arrangement of what is capped and what is sealed, however, comes from the specification.

The copper pipe that forms the torch portion has a pipe fitting on the bottom with a plug in it, and "[t]his creates a vessel or fuel canister." '317 Patent col.2 l.61. The bottom has a "cap," and this is where the "seal" is because a seal, or a complete closing off, prevents fuel from leaking. The top of the pipe has "a standard one and one-fourth inch copper cap" that has a hole drilled for a wick. Id. col.2 ll.63-64. The cap can be

9

friction fit or soldered, with the first option being the preferred method. In either case, there remains a hole in the top for a wick. This hole can allow fuel to evaporate. Thus, the top of the tank is not completely closed off; the top is merely capped. Thus, the torch portion is capped and sealed on the bottom so that fuel does not leak, and the top is only capped.

The vertical portion is copper pipe and connects to the torch portion by a copper pipe reducer element. A copper pipe reducer element is "a part that connects two hollow copper bodies of different sizes." (Def.'s <u>Markman</u> Br. at 13.) Thus, the vertical portion and torch portion are not of the same diameter pipe. The parties disagree over how the copper pipe reducer element is actually formed and the meaning of "connects."

The best interpretation of the '371 Patent is that the copper pipe reducer element does not have to be a separate piece. Woodstock argues that the copper pipe reducer element "need not be a separate and distinct item, but may simply be an integrated part of the 'torch portion' or an integrated part of the 'vertical support portion.'" (<u>Id.</u>) Gardendance argues the interpretation should clearly spell out that the copper pipe reducer element is a separate piece.

The best interpretation is that the element does not have to be a separate piece; the element can be one with another part of

the torch, or it may be a separate element. Nothing in the claim states that the copper pipe reducer element is a separate piece from the torch portion. Also, the specification states that "it is obvious that modifications and changes . . . may be made by those skilled in the art" of coppersmithing "without departing from the spirit and scope of the invention." '371 Patent col.4 ll.4-7. Thus, the specification shows that the claim terms should be construed to allow minor modifications that do not otherwise depart from the spirt and scope of this patent. Someone versed in coppersmithing, even if it takes as much time as Gardendance suggests in its brief, could make the torch portion and copper pipe reducing element into one unit and otherwise still construct the torch covered by this patent. When those two pieces are actually one piece, that torch retains its variable nature in that a user could still create a variety of torch units, including lawn and table-top units, and units with one, two, or more torches. One has a variable torch even if the two elements are actually one element. Making the torch unit and copper pipe reducing element into one is within the claim terms, and the copper pipe reducing element may or may not be a separate piece.

The parties also disagree over the term "connects," which appears in the third paragraph of Claim 1. The base portion, which neither party disputes is made of copper pipe, is

11

"connected to [the] vertical portion." Id. col.4 l.18. The proffered definition is that "connects" means "to associate," which Gardendance suggests "is a definition meant in an intangible[] sense and not in a physical sense." (Pls.' Response Ct.'s Req. Final Cl. Interpretation Submissions at 14.) While Gardendance's argument is not entirely clear, the argument seems to be that Woodstock wants "connect" to mean "associate" so that the Gardendance torch will more clearly infringe the '371 Patent.

The best interpretation is that "connects" means that the base part and the vertical portion join or associate together. The base portion may be in one of two configurations, which are discussed below at Claim 4. See infra Section II.B.4. The base may be a separate element or simply the end of the vertical portion (meaning it is one with the vertical portion, as the reducing element may be). In either case, the base portion connects to the vertical portion in that the separate element or the end of the vertical portion both join or associate with the vertical portion.

2. Claim 2

Claim 2 states: "[t]he variable torch apparatus of [C]laim 1 wherein said copper pipe reducer element forms the bottom of said torch portion fuel canister." '371 Patent col.4 ll.20-22. By its terms, Claim 2 modifies Claim 1's description. Claim 2 places the copper pipe reducing element on the bottom of the

12

torch portion, which is neither an unreasonable definition nor in conflict with the plain meaning or the specifications. Thus, Claim 2 is construed with these meanings.

3.   Claim 3

Claim 3 states: "[t]he variable torch apparatus of [C]laim 1 wherein said vertical support portion is approximately six feet in length." Id. col.4 ll.23-24. Claim 3 modifies Claim 1 by stating the vertical portion is approximately six feet in length. Any other interpretation would be unreasonable. Thus, Claim 3 is construed with these meanings.

4.   Claim 4

Claim 4 states: "[t]he variable torch apparatus of [C]laim 1 wherein said base portion comprises a point." Id. col.4 ll.25-26. The proffered definition of "point" is "the sharp end of anything." http://www.onelook.com/?other=web1913&w=point (last visited Oct. 11, 2005). In being "anything," the "point" may be an actual pointed element attached to the bottom of the pipe or "simply the terminal end of the pole portion." '371 Patent col.3 ll.39-40. Thus, the base part can be the end of the vertical support portion. Gardendance argues that the definition proffered would confuse a jury because the base portion becomes the middle part. Defining the base part as the end of the vertical support part or as a separate pointed element is neither

13

confusing nor unreasonable in light of the claims and the specification.

    5.    Claim 7

Claim 7 states: "[t]he variable torch apparatus of [C]laim 1 wherein said torch portion is capped with a copper cap that has been drilled to accommodate a wick." Id. col.4 ll.34-36. The proffered interpretation of this claim is that the luminary part has a hole, through which the wick is placed. The wick protrudes out of the hole at the very top of the apparatus. Thus, the wick comes out of the top of the torch portion, allowing the top of the wick to burn while the bottom of the wick is in the fuel canister. This is not an unreasonable interpretation and does not conflict with the claim terms' text or the specification. Thus, Claim 7 is construed with these meanings.

### III. CONCLUSION

For the reasons set forth above,

IT IS ORDERED that the meaning and scope of the U.S. Patent No. 5,547,371 Patent claims asserted to be infringed and presented by the parties for construction are determined as set forth in this memorandum opinion.

This the 12th day of October 2005.

                                                    /s/ William L. Osteen
                                                  United States District Judge